UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARLEY McNEIL, | No. 1:15-cv-01442-AWI-GSA |
| Plaintiff, | **FINDINGS AND RECOMMENDATION TO REVERSE DEFENDANT'S DENIAL OF SUPPLEMENTAL SECURITY INCOME TO PLAINTIFF AND REMAND FOR PAYMENT OF BENEFITS** |
| v. | |
| NANCY A. BERRYHILL, Commissioner of Social Security, | |
| Respondent. | |

I.     <u>Introduction</u>

Plaintiff Harley McNeil ("Plaintiff"), by his guardian ad litem Janice Lingenfelter, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Supplementary Security Income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge. *See* Docs. 49 and 50**.**

Having reviewed the parties' submissions and the record as a whole, the undersigned concludes that the administrative law judge made a legal error at step two of the benefits analysis. Correcting the error results in Plaintiff's satisfying the requirements of Listing 12.05C and qualifying for benefits. Accordingly, the undersigned recommends that the Court reverse Defendant's denial of benefits and remand this case for payment of benefits to Plaintiff.

1

## II.     Procedural Background

Plaintiff had previously applied for supplemental security income on multiple occasions but the total number and timing of these applications is not apparent from the record.  *See* AR 283.  In 2007, the Commissioner denied the then-pending application and found Plaintiff capable of simple, repetitive tasks.  AR 61, 283.  In November 2010, the Commissioner denied a later application after Plaintiff was returned to prison following a parole violation, precluding his participation in consultative examinations.  AR 61, 299-309, 311.

On May 7, 2012, Plaintiff filed the application for supplemental security income that is the subject of this appeal.  AR 17.  He alleged disability beginning March 1, 1978.  AR 17.

The Commissioner denied the application initially on September 13, 2012, and upon reconsideration on March 13, 2013.  AR 12.  On March 18, 2013, Plaintiff filed a timely request for a hearing before an Administrative Law Judge.  AR 17.

Administrative Law Judge Tamia N. Gordon presided over an administrative hearing on January 31, 2014.  AR 17.  Plaintiff, proceeding *pro se*, appeared and testified.[1]  AR 17.  An impartial vocational expert, Cheryl Chandler, also appeared and testified.  AR 17.

On March 12, 2014, the ALJ denied Plaintiff's application.  AR 17-25.  The Appeals Council denied review on July 31, 2015. AR 1-4.  On September 23, 2015, Plaintiff filed a timely complaint seeking this Court's review.  Doc. 1.

## III.     Factual Background

### A.     General Information

When Plaintiff (born October 21, 1961) was fifteen years old, he was seriously injured in a single-vehicle motor cycle accident, incurring a traumatic brain injury, broken jaw and other severe facial injuries, a broken clavicle, and various other severe bodily injuries. AR 38-39. Following the accident, he remained hospitalized in a coma for approximately nine months.  AR 50, 201.

---

[1] Plaintiff's friend, Janice Lingenfelter, sought to act as Plaintiff's representative at the hearing but was not permitted to participate.  *See* AR 9-11.  Ms. Lingenfelter serves as Plaintiff's *guardian ad litem* before this Court.  Doc. 48.

1    Plaintiff, who completed tenth grade before the accident, recalled having a B average

2    before he was injured.  AR 190.  After he completed treatment he attended continuation school

3    but received neither a diploma nor a certificate of completion.  AR 36-37.  TABE testing in prison

4    determined that Plaintiff had an educational level of grade 2.9.  AR 378. Although Plaintiff did

5    farm labor and irrigation work before the accident, he has not worked thereafter.  AR 190, 197,

6    253, 271, 318.

7            Following the accident, Plaintiff was cared for by his parents and siblings.  AR 378.  At

8    the time of the hearing, Plaintiff lived in a mobile home parked in the yard of Ms. Lingenfelter's

9    home.  AR 150.  Ms. Lingenfelter provided supervision and support to Plaintiff and did not

10   charge him rent.  AR 150.

11           Plaintiff has a history of criminal behavior including disturbing the peace, defrauding an

12   innkeeper, petty theft, fighting in public, noise, offensive words, inducing a minor to use or sell

13   marijuana, contributing to the delinquency of a minor, assault, disorderly conduct, domestic

14   abuse, violation of parole, indecent exposure, soliciting a lewd act and failing to register as a sex

15   offender.  AR 341.

16           Plaintiff's most serious crime was the rape of a family member for which he was found

17   incompetent to stand trial.  AR 378.  From March 2005 through August 2006, Plaintiff was

18   treated at Atascadero State Hospital to restore competence.  AR 378.  (Plaintiff testified that he

19   received some type of care in "some type of a ward, a hospital, or something" while he was in

20   prison, but he was unable to explain the nature of the treatment.  AR 45.)  Thereafter, Plaintiff

21   served a prison term for the rape conviction.[2] AR 343.

22           The record reveals multiple parole violations, usually for using alcohol.  *See, e.g.,* AR

23   341.  Plaintiff, who had his first beer when he was thirteen, admitted that he had been an

24   "[a]lcoholic since the time of a young person or most of my adult life."  AR 194, 379.

25   ///

26   _____

27   [2] In 2007, Plaintiff explained to his parole officer that he was drunk and thought the sexual intercourse was
     consensual.  AR 377.

28                                                        3

## B.    Adult Function Reports

Plaintiff filed adult function reports on July 3, 2012, and February 12, 2013.  AR 168-75, 214-22.  His daily activities included brushing teeth, eating breakfast, watering the grass, listening to the radio or watching television, drawing and eating lunch.  AR 168.  He did yardwork weekly. AR 170.  He shopped and visited his adult daughter once or twice monthly, and regularly attended church services and AA meetings.  AR 171-72.  Plaintiff stated that his ability to get along with authority figures is "very sketchy," he does a fair job of handling stress, and he does not handle changes in routine well. AR 174.

Ms. Lingenfelter filed third party adult function reports on February 3, 2012, and February 12, 2013.  AR 177-84, 223-31.  Reiterating the daily activities reported in Plaintiff's adult function report, Ms. Lingenfelter described Plaintiff's daily activities as "alot of nothing."  AR 177.  He required reminders to change clothing, wash clothing, and shower.  AR 179.  Although he could make a sandwich, he could not clean or prepare food for meals.  AR 179.  Plaintiff could not pay bills, handle a savings account, or use a checkbook or money orders, but he could count change and handle an "allowance-type debit [card]."  AR 180.

Plaintiff's condition affected his memory, completion of tasks, concentration, understanding, following instructions and getting along with others.  AR 182.  He could neither understand how to accomplish a task nor remember instructions.  AR 180.  He could sometimes follow spoken instructions but never follow written instructions.  AR 182.  Plaintiff did not get along well with authority figures or handle stress or changes in routine well.  AR 183.  He was fearful when threatened in any manner. AR 183.  She remarked:

> [Plaintiff] is immature.  His mind-set is at the age of 15 and will not and has not changed in all the years since I have known him.  He cannot react like an adult with reason and reality.  He is slow at tasks and becomes distracted and becomes fixated at times.

> AR 230.

///

///

4

C.     **Miscellaneous Agency Records**

In a field office report dated August 18, 2010, the interviewer noted that it "sounds like [the Plaintiff] has mental problems from the way he talks and brings up info on questions not asked of him." AR 166. In another field office report, a different interviewer noted, "He talked and rambled when not being spoke[n] to and kept referring to his accident back in 1978, and how he's glad he's not in a wheelchair." AR 188.

On September 10, 2012, agency psychologist Thomas D. Stern, Ph.D., performed the psychiatric review technique within the case record. AR 65-66. Dr. Stern based his analysis on the consultative opinion of psychologist Steven Swanson, Ph.D. AR 67. . Dr. Stern opined that Plaintiff's primary impairment diagnosis was non-severe affective disorder and his second impairment diagnosis was severe organic brain syndrome. AR 65. Dr. Stern rated Plaintiff's nonsevere alcohol, substance abuse disorders as having "other" priority. AR 65. He opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and no repeated episodes of decompensation. AR 66. Accordingly, he concluded that Plaintiff did not satisfy Listings 12.02 (organic mental disorders), 12.04 (affective disorders), or 12.09 (substance addiction disorders). AR 66. Dr. Stern did not consider Listing 12.05 (mental retardation). According to Dr. Stern, no medical or other source set forth an opinion more restrictive than his opinion. AR 69.

On March 13, 2013, agency physician A. Garcia, M.D., repeated the psychiatric review technique on reconsideration and reached the same conclusions as Dr. Stern. AR 85-86.

D.     **Medical Records**

1.     **Materials in Record From Prior Applications[3]**

a.     **Neurological Consultative Examination (2007)**

On August 11, 2007, neurologist Abbas Mehdi, M.D., submitted a report of his

---

[3] In his responsive brief, Defendant objects to the use of IQ scores obtained in 2007, contending that the Court should not consider evidence introduced in prior applications. Although Defendant's contention is generally correct, the ALJ's analysis considered evidence from Plaintiff's 2007 and 2010 applications. Accordingly, evidence from those applications is included in these findings and recommendations.

consultative examination of Plaintiff.  In summarizing Plaintiff's medical history, Dr. Mehdi

noted the motorcycle accident in which Plaintiff incurred multiple injuries including traumatic

brain injuries and noted that Plaintiff reported back and leg pain, difficulty walking, headaches

and tremors in his legs:

> [T]he claimant suffers likely from static encephalopathy, mild mental retardation and perhaps may have not had any mental growth over the age of 15 or 16.  This is a 44-year-old male who seems to be reasonably clean but absolutely had no insight into the importance of expressing the disease that he had.  He lives with his brother.  I believe his father just passed away.  The claimant was more interested in telling me about an autograph of a bullrider.

AR 263.

Dr. Mehdi observed that Plaintiff walked with a spastic gait and spoke in a monotonous

slow voice.  AR 264.  He had prominent facial scars indicating jaw fractures and fractures of the

forehead.  AR 264.  He was oriented to time, place and person but the orientation was shallow.

AR 264.

Dr. Mehdi opined:

> Likely he has spinal cord damage and giving symptoms of myelopathy mainly because of the spasticity and hyperreflexia of the lower extremities.  The myelopathy could be in the thoracic spine because the upper extremity reflexes were slightly less brisk than the lower extremities.  However, this could also be secondary to traumatic brain injury.

> Furthermore, the claimant clearly has mental delays and developmental delays.

AR 266-67.

The range of motion of Plaintiff's cervical spine was slightly limited, although the

contour, curvature, and alignment were normal.  AR 264.  The range of motion of Plaintiff's

lumbar spine was more severely limited.  AR 265.  Shoulder abduction, flexion, and adduction

were also limited.  AR 265.  Range of motion of the elbows, wrists hips, knees, and ankles was

within normal limits.  AR 265.  Dr. Mehdi noted lumbar area spasms and "[p]rominent and severe

spasms of the lower extremities."  AR 265.

///

6

The doctor opined that Plaintiff was able to carry ten pounds occasionally and less than ten pounds frequently, stand and walk two to four hours in an eight-hour work day, and sit six hours in an eight-hour work day with normal breaks. AR 267. "Exertional limitations include climbing, stooping, kneeling, pushing, balancing, crouching, crawling and pulling." AR 267.

### b. Psychological Consultative Examination (2007)

Clinical psychologist Richard Engeln, Ph.D., examined Plaintiff on August 30, 2007. AR 271-74. Rochelle Cross, a counselor at the transitional facility at which Plaintiff then lived, told Dr. Engeln that Plaintiff had episodes of confusion. AR 272. Plaintiff was receiving follow up psychiatry through the Parole Department and took psychiatric medication (Geodon). AR 272; 273.

Engeln administered several achievement and intelligence tests and summarized the findings as follows:

> Obtained intellectual measurements are verbal intelligence mid borderline, and visual intelligence high in the mild range of mental retardation. [Plaintiff] achieved the following IQ estimates on the WAIS-III: Verbal IQ = 76; Performance IQ = 68; Full Scale IQ = 70. Working memory, an immediate memory functioning for non-meaningful material, reflecting processing skills, was measured 81, low average. Grapho-motor reproductions were assessed by means of the Bender Gestalt II norms. [Plaintiff] achieved a Standard Score of 92, average, on the copy phase; Standard Score of 75, borderline, on the Recall Phase. Academic skills were screened by means of the Wide Range Achievement Test, and [Plaintiff] achieved the following Grade Equivalent Scores: Reading = beginning eighth; Spelling = beginning sixth; Arithmetic = end fourth. Other standard scores on the WMS-III were: Immediate Auditory Memory = 74, borderline; Delayed Auditory Memory = 83, low average; Auditory Recognition Delayed = 55, moderate range of mental retardation; Immediate Visual Memory = 45; Delayed Visual Memory = 47, both estimates in the moderate range of mental retardation. The obtained visual memory scores appear inconsistent with the protocol, and generally reflect concentration issues.

AR 273.

Dr. Engeln opined:

> [Plaintiff] presents with dimensions of dementia, and probable chronic schizophrenia, that intrude on his ability to manage his own funds independently, or to make independent job adjustment

7

successfully. All issues are exacerbated by alcohol abuse, and it is noted that in the past he has made job adjustments, certainly, in an entry level position, where instructions are one-dimensional and where normal supervision is provided. He has the ability to receive instructions that are simple and one-dimensional; but mental health issues, and alcohol issues have intruded on ability to make an entry level job adjustment.

AR 271.

### c. <u>Prison Mental Health Services</u>

In a May 19, 2009, evaluation conducted in anticipation of Plaintiff's upcoming parole release, psychologist Alvin Chandler II, Ph.D., summarized that Plaintiff had symptoms of a mental disorder and cognitive limitations secondary to a severe brain injury. AR 316.

While present in the CDCR reception center on June 17, 2009, following a parole violation, Plaintiff was briefly evaluated by psychologist W. Prince, Psy.D., who noted inappropriate laughter, impaired recent and remote memory, and disorganized and circumstantial thought process. AR 290-91. Plaintiff did "not know what he [was] doing in prison." AR 290. Dr. Prince diagnosed Axis I as "Psychosis NOS" and determined a GAF of 44[4] but deferred other diagnoses. AR 290. Because Plaintiff had communication problems arising from his head injury, the doctor spoke slowly, used simple language, and reduced distractions to achieve appropriate responses. AR 288. On June 18, 2009, Plaintiff demonstrated incongruent affect, loose thought process, and slow speech, but told Dr. Prince, "I only have 6 or 7 months left. I'm OK." AR 289.

In a follow-up on July 30, 2009, Plaintiff was oriented on only one dimension and demonstrated impaired memory, judgment, and insight, but his GAF had improved to 60.[5] AR 286. Plaintiff had not yet received a Clark evaluation.[6] AR 286.

---

[4] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 41-50 corresponds to serious symptoms or a serious impairment in social, occupational, or school functioning. *Id.*

[5] A GAF of 51-60 corresponds to moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* at 32-35.

[6] A 2001 settlement agreement established a set of policies and procedures (collectively, the Clark Remedial Plan) to ensure that "California prisoners with developmental disabilities [are] protected from serious injury and discrimination on account of their disability." *Clark v. California*, 739 F.Supp.2d 1168, 1172 (N.D.Cal. 2010). As

8

On October 21, 2010, psychiatrist F. Kleist, M.D., conducted a psychiatric evaluation of Plaintiff. AR 334. Treatment with antipsychotic drugs had been discontinued after Plaintiff had been diagnosed with dementia secondary to head trauma and polyalcohol abuse. AR 334. Plaintiff, who was then 49 years old, had a documented suicide attempt at age 48. AR 334. Dr. Kleist noted that Plaintiff was in "total denial," confused and disoriented as to his place and situation. AR 334. The doctor did not think that medication would help Plaintiff since his impairments were "congruent with his severe [traumatic brain injury]." AR 334. Psychologist S. Johnson, Ph.D., evaluated Plaintiff the next day (October 22, 2009) and noted Plaintiff's mental health history and status as a developmentally disabled inmate (DD2).[7]

Following an interview with Plaintiff on October 25, 2010, an unidentified reporter indicated that Plaintiff had symptoms of major depression and a possible thought disorder. AR 322.

In an initial evaluation on January 27, 2011, Dr. Chandler noted that Plaintiff "could not stop talking" although the content was tangential. AR 317. He did not know the month or year. AR 320. Plaintiff was "limited" in all areas of cognition, including fund of information,

///

---

an initial step and continuously throughout their confinement, CDCR personnel must properly identify developmentally disabled prisoners to ensure that they receive appropriate accommodation under the Americans with Disabilities Act and the Rehabilitation Act of 1973. *Id.* at 1178.

[7] "[A] developmental disability is a severe, chronic condition that manifests in the developmental period (birth through age 18), requires an array of mild to intensive supports, and is expected to last a lifetime. Developmental disabilities may be cognitive, physical, or a combination of both." *Clark,* 739 F.Supp.2d at 1185 (internal citations and quotation marks omitted). Traumatic brain injury within the relevant period is a developmental disability. *Id.*

"Mental retardation is commonly classified as 'mild,' 'moderate,'or 'severe' in diagnostic and clinical settings. *Id.* Every person with mental retardation, including those whose disability is classified as "mild," has significant functional impairments compared to persons without mental retardation. *Id.* "[T]hey have 'low functional skills across the board (e.g., communication, socialization, community/home, independence, and functional academics)." *Id.* Accordingly, those with developmental disabilities "may require assistance in multiple areas." *Id.* They "may have difficulty maintaining work assignments due to inappropriate social behavior and a lack of relevant work skills" and "may be unable to apply functional academic skills to work assignments including managing oneself at work and communicating with individuals in the workplace." *Id.*

CDCR classifies prisoners with developmental disabilities into three categories (DD1, DD2, or DD3) depending on their support needs. "Prisoners classified as DD1 are equivalent to those with 'mild' mental retardation," who require a variety of adaptive supports despite being "higher functioning. Prisoners classified as DD2 function in the "moderate" range of mental retardation and, therefore, require more frequent prompts and adaptive supports than DD1 prisoners. *Id.* at 1188 (citations omitted). As noted, CDCR determined Plaintiff to fall within the DD2 category.

intellectual functioning, concentration, attention, and memory. AR 320. Insight and judgment were poor. AR 320.

On February 24, 2011, Dr. Chandler described Plaintiff as "a somnolent, scattered and childlike person with mental issues." AR 325. Plaintiff displayed odd, strange gestures and limited ability to follow the conversation. AR 325.

When Plaintiff and Dr. Chandler met on April 29, 2011, for a regular scheduled meeting, the doctor observed that Plaintiff was "clearly impaired" with "pronounced tangential ideation with inappropriate affect and childlike mannerisms." AR 324. Plaintiff continued to have difficulty following a conversation. AR 324.

On September 1, 2011, a psychologist at North Kern State Prison[8] met with Plaintiff to assess him for crisis management and suicide prevention. AR 335. Plaintiff denied current suicidal or homicidal intent. AR 335. Plaintiff also denied past attempts of suicide, although the psychologist knew that Plaintiff had a history of attempting suicide. AR 335. Although Plaintiff was oriented, he demonstrated agitated behavior, blunted affect, a flat facial expression, pacing and poverty of speech. AR 335.

### 2. Medical Records—Current Application

#### a. Consultative Psychological Assessment (2012)

On August 21, 2012, clinical psychologist Steven C. Swanson, Ph.D., conducted a psychological examination at the request of the state agency. AR 346-50. He reported that Plaintiff had a long history of alcoholism and smoked marijuana intermittently, but that Plaintiff had "never been hospitalized in a psychiatric setting," although he also reported that Plaintiff had spent a year in treatment at Atascadero State Hospital. AR 347; 349. Plaintiff told Dr. Swanson that he had no difficulty reading or writing. AR 347. Dr. Swanson opined that "[Plaintiff] is independently able to complete all activities of daily living," and that "[h]is mental and emotional functioning falls generally within normal limits." AR 347, 349.

---

[8] Much of the psychologist's handwriting, including his or her signature, is illegible.

In a section labelled "Test Results,"[9] Dr. Swanson generally reported administering the Mini Mental Status Exam but did not detail Plaintiff's responses. AR 348. He opined that Plaintiff demonstrated no signs or depression or psychosis, and that Plaintiff's movement, mood, speech, memory, attention, judgment, insight, thoughts and perception were within normal limits. AR 348. Dr. Swanson estimated that Plaintiff fell in the borderline range of intelligence. AR 348.

Dr. Swanson diagnosed Plaintiff:

| Axis I | 303.90 | Alcohol Dependence, In Remission |
|---|---|---|
| | 305.20 | R/O Cannabis Abuse |
| Axis II | 301.7 | Antisocial Personality Disorder |
| | V62.89 | Borderline Intellectual Functioning |
| Axis III | | MVA (at 15) |
| Axis IV | | Unemployment |
| | | On Parole |
| | | Many Incarcerations |
| Axis V | | GAF = 60 (current) |

AR 349.[10]

Dr. Swanson opined:

> He is judged able to maintain concentration and relate appropriately to others in a job setting. He would be able to handle funds in his own best interests; however, he may be at risk of using such funds for the purchase of alcohol and/or marijuana. He is expected to understand, carry out, and remember simple instructions. He is judged able to respond appropriately to usual work situations, such as attendance, safety, and the like. Changes in routine would not be very problematic for him. There do not appear to be substantial restrictions in daily activities. Difficulties in maintaining social relationships do not appear to be present.

AR 349.

Notably, Dr. Swanson's report did not mention that Plaintiff had incurred a traumatic brain injury.

///

///

---

[9] Dr. Swanson's invoice to the state agency indicated that he performed no standardized testing of Plaintiff. AR 352.
[10] A GAF of 51-60 corresponds to moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders IV* at 32-35.

### b. North Star Counseling

In an initial evaluation report prepared by North Star Counseling, Plaintiff's therapist (name illegible) listed Plaintiff's presenting problems as traumatic brain injury, alcohol problems, anxiety, unemployment and low mood. AR 353. Severe symptoms included sadness, distress, distractibility, disorganization, aggression and slowed response. AR 353. Moderate symptoms included low energy, generalized anxiety and substance abuse. AR 353. Mild symptoms were hopelessness, elation, panic, obsession, hyperactivity and "relationship." AR 353. Plaintiff was to participate in weekly therapy sessions. AR 353.

### c. Central Valley Indian Health

Following his 2012 parole release, Plaintiff received routine medical care at Central Valley Indian Health, Clovis, California. AR 357-69. A substantial portion of these handwritten records is illegible. In July and August 2012, Plaintiff's primary care physician, Aaron C. Kissel, M.D., prescribed an antidepressant after North Star Counseling diagnosed Plaintiff with major depression. AR 357. (Plaintiff was required to discontinue the prescription (Zoloft) due to a liver problem. AR 255, 366.) Dr. Kissel noted psychomotor retardation but no psychosis. AR 357. He observed that Plaintiff's speech and cognition were slow secondary to his traumatic brain injury. AR 357.

### E. Parole Records

Beginning on May 30, 2007, Plaintiff received counseling from psychologist Laura Hernandez, Ph.D., of the State of California Parole and Community Services Division. AR 210. Dr. Hernandez provided "counseling for issues related to cognitive impairment, and impulsiveness connected to criminal behavior." AR 210.

In a June 8, 2012, evaluation, Dr. Hernandez diagnosed Plaintiff:

| | | |
|---|---|---|
| Axis I | 294.1 | Dementia Due to Head Trauma |
| | V61.83 | Sexual Abuse of an Adult |
| | 304.80 | Polysubstance Dependence |
| Axis II | 799.9 | Diagnosis Deferred |
| Axis III | | Medical Concerns: History of Head Injury |

| Axis IV | Psychosocial Stressors: Parole Status |
|---------|---------------------------------------|
| Axis V  | GAF=45                                |

AR 377.[11]

Dr. Hernandez observed that although Plaintiff was alert and oriented, his speech was pressured and psychomotor retardation was apparent. AR 378. His thought processes were tangential although he was easily redirected. AR 378. He expressed circumstantial and perseverative thought processes. AR 378. Verbal production and fund of information suggested borderline intellectual functioning. AR 378. Insight and judgment were poor. AR 378.

Tanya Smith, Plaintiff's non-attorney case manager in CDCR's Transitional Case Management Program, submitted an undated disability report on Plaintiff in anticipation of his scheduled parole release in October 2012. AR 196-203. Ms. Smith identified Plaintiff's disabling condition as (1) developmental disability; (2) severe head trauma with loss of consciousness; (3) back pain; (4) lower back [*sic*]; and (5) mental issues. AR 197. Because of his condition, Plaintiff was "[u]nable to provide needed equipment, wash clothing and cook food." AR 211. Ms. Smith remarked:

> [Plaintiff] has [a] mental disability that causes confusion and fear in his day to day situations and existence. He cannot remember necessary information and directions that would enable him to be self-sufficient. He needs assistance financial and physical. He could not take care of himself, he needs a caretaker or companion. He is unable to have rational thought process necessary for his day to day existence or daily life.
>
> He can be helpful, thoughtful and reasonably normal but not able to discern needed reasonable skills to support his life.

AR 203.

Following his parole release, Plaintiff lived in a mobile home on Ms. Lingenfelter's property. AR 378. Dr. Hernandez noted that Ms. Lingenfelter "provid[ed] for him and serve[d] a parental role in monitoring his ADL's and other day-to-day needs. His cognitive limitations are such that he could doubtfully take care of himself." AR 378.

---

[11] A GAF of 41-50 corresponds to serious symptoms or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders IV* at 32-35.

## IV.    Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.    The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment of impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a

14

specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.920(a)(4). The ALJ must consider objective medical evidence and opinion testimony. 20 C.F.R. §§ 416.927; 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. §§ 416.920(a)-(f).

In addition, when an applicant has one or more previous denials of applications for disability benefits, as Plaintiff does in this case, he or she must overcome a presumption of nondisability. The principles of *res judicata* apply to administrative decisions, although the doctrine is less rigidly applied to administrative proceedings than in court. *Chavez v. Bowen,* 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen,* 844 F.2d 664, 666 (9th Cir. 1988).

Social Security Acquiescence Ruling ("SSR") 97–4(9), adopting *Chavez,* applies to cases such as this one involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim in which there has been a final administrative decision that the claimant is not disabled. A previous final determination of nondisability creates a presumption of continuing nondisability in the unadjudicated period. *Lester v. Chater,* 81 F.3d 821, 827 (9th Cir. 1995). The presumption may be overcome by a

///

15

showing of changed circumstances, such as new and material changes to the claimant's residual

functional capacity, age, education, or work experience. *Id.* at 827–28; *Chavez,* 844 F.2d at 693.

## VI.  Summary of the Hearing Decision

The hearing decision acknowledged that Plaintiff had one or more prior applications for

supplemental security income (AR 20, 22), but did not explicitly address Social Security

Acquiescence Ruling ("SSR") 97–4(9), *Chavez,* 844 F.2d at 693, or the presumption of

nondisability.

Using the Social Security Administration's five-step sequential evaluation process, the

ALJ determined that Plaintiff did not meet the disability standard.  AR 13-22.  The ALJ found

that Plaintiff had not engaged in substantial gainful activity since the application date of May 7,

2012.  AR 19.  Plaintiff's only severe impairment was borderline intellectual functioning

secondary to post-traumatic brain injury in 1978.  AR 19.  The severe impairment did not meet or

medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20

C.F.R. §§ 416.920(d); 416.925; and 416.926).  AR 20-21.  The ALJ concluded that Plaintiff had

the residual functional capacity to perform the full range of work at all exertional levels but that

he was limited to simple, repetitive tasks.  AR 21-24.

Plaintiff had no past relevant work.  AR 24.  Relying on a vocational expert's testimony,

the ALJ concluded that Plaintiff could perform other jobs available in the national economy.  AR

25.  Accordingly, the ALJ found that Plaintiff was not disabled.  AR 25.

## VIII.  The ALJ Erred in Identifying a Single Severe Impairment
## at Step Two[12]

[12] Courts generally do not address issues not raised by the parties on appeal.  F.R.App.P. 28(a); *Crawford v. Gould*, 56 F.3d 1162, 1169 (9th Cir. 1995).  Nonetheless, a court may raise an issue *sua sponte* to prevent injustice, *Morales v. Astrue*, 2010 WL 2629571 at *8 (C.D.Cal. June 29, 2010) (No. CV 09-2494-PJW), or to raise an affirmative defense not raised by the defendant, *Tahoe-Sierra Preservation Council, Inc., v. Tahoe Regional Planning Agency*, 216 F.3d 764, 788-89 (9th Cir. 2000), overruled on other grounds, *Gonzales v. Arizona*, 677 F.3d 383, 389 n. 4 (9th Cir. 2012).  *Moore v. Astrue*, 2011 WL 1532407 at *3 (D. Mont. Mar. 30, 2011) (No. CV-10-36-GF-SEH-RKS).  Fully addressing Plaintiff's arguments on appeal required the undersigned to reorganize Plaintiff's issues and Defendant's responses to permit complete and orderly analysis of how the proceedings below complied and failed to comply with regulatory requirements and to articulate completely and accurately the matters to be addressed on remand.  To the extent that the reorganized discussion could be interpreted to raise issues independent of those advanced by the parties, the undersigned presents them in the interest of preventing injustice.  Ultimately, any such issues are consistent with Plaintiff's overriding contention that he was wrongfully denied supplemental security

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii). An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments. 20 C.F.R. § 416.902(f). If a claimant does not have an impairment of combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment. 20 C.F.R. § 416.920(c).

In Plaintiff's case, the ALJ found a single severe impairment: "borderline intellectual functioning secondary to post traumatic brain injury." AR 19. The ALJ found that Plaintiff also had the following impairments which were not severe: major depressive disorder, antisocial personality disorder, "alcohol abuse in alleged remission," "marijuana abuse in alleged remission," back pain and lumbar strain. AR 19.

### A.     The Severity Regulation Imposes a *de Minimus* Standard at Step Two

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['s] ability to work." *Id.* at 1290; SSR 85-28. "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'" SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)). Major depressive disorder, antisocial personality disorder, "alcohol abuse in alleged remission," "marijuana abuse in alleged remission" and back (lumbar) pain are not generally considered to be impairments of so minimal a nature that they could never prevent a person from working.

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his or

---

income.

her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The ruling warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, it the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291. Similarly, finding Plaintiff's secondary impairments to be not severe at step two resulted in their having been omitted from subsequent steps of the disability analysis.

### B. An ALJ May Not Isolate Only Evidence Supporting Her Conclusions

In addition, an ALJ may not find an impairment to be not severe by discussing only those portions of the treatment record that favor that conclusion. "Although it is within the power of the Secretary to make findings concerning the credibility of a witness and to weigh conflicting evidence, *Rhodes v. Schweiker*, 660 F.2d 722, 724 (9th Cir. 1981), he cannot reach a conclusion

first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982)." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). It is legal error to ignore medical evidence of a claimant's other impairments without giving specific, legitimate reasons for doing so. *Smolen*, 80 F.3d at 1282.

Although the ALJ attempted to provide reasons for categorizing Plaintiff's other impairments as not severe, her reasoning is conclusory and not fully developed, and primarily relies on Plaintiff's testimony at the administrative hearing.[13] Viewed in the context of the record as a whole, the ALJ's findings are contrary to substantial evidence. The ALJ neither acknowledges nor explains her reasons for ignoring contrary evidence.

### 1. Depression

The ALJ concluded that Plaintiff's major depressive disorder was nonsevere due to his lack of follow-up treatment following the diagnosis, and his testimony that he did not need medication. However, Plaintiff did not testify that he did not need antidepressive medication; he testified that he took only vitamins and emphasized that they were "legal." AR 40-41.

The evidence included in the record as a whole reveals that the ALJ did not fully and fairly consider the evidence of Plaintiff's depression included in the record as a whole. Plaintiff was diagnosed with major depressive disorder on at least three occasions: October 25, 2010 (AR 322); January 17, 2013 (AR 353); February 5, 2013 (AR 357). He had a history of attempting suicide. AR 335. Dr. Kissel prescribed Zoloft, an anti-depressant, but contrary to the ALJ's presumption that Plaintiff chose not to take it, the record reveals that Plaintiff was required to discontinue use when it exacerbated his liver disease. AR 255, 357, 366.

---

[13] The ALJ's reliance on Plaintiff's testimony at the administrative hearing is of concern for multiple reasons. The administrative includes numerous professional observations of Plaintiff's intellectual impairment, lack of insight into his own disability, inability to advocate on his own behalf, and general communication impairment. These impairments are apparent from Plaintiff's testimony as memorialized in the transcript of the administrative hearing. AR 30-59. Nonetheless, the ALJ excluded from the administrative hearing Ms. Lingenfelter (who accompanied Plaintiff and had consistently indicated that she was acting as Plaintiff's representative) and persuaded Plaintiff to waive counsel to assist him in the hearing before using his imprecise and rambling testimony to deny him SSI benefits.

The ALJ's conclusion that Plaintiff chose not to participate in follow-up counseling is similarly unsupported. According to a January 2013 report, Plaintiff was to receive weekly individual counseling at North Star Counseling, which noted among his symptoms severe sadness and distress, and moderate low energy. AR 353. By February 2013, Plaintiff had entered a residential substance abuse treatment program, the likely reason why he was not then attending outpatient counseling at North Star. AR 84. In March 2013, agency physician A. Garcia attempted to telephone Plaintiff but because Plaintiff did not call back, Dr. Garcia did not request records of Plaintiff's treatment after January 2013. AR 84.

Because Plaintiff's depression had the capacity to have more than a minimal effect on Plaintiff's ability to work, major depression should have been categorized as a severe impairment.

### 2. Antisocial Personality Disorder

With regard to Plaintiff's antisocial personality disorder, the ALJ stated only that Dr. Swanson diagnosed antisocial personality disorder despite opining that Plaintiff had no problem maintaining social relationships. AR 19. Thus, she found Plaintiff's antisocial personality disorder to be nonsevere (AR 19) despite his history of criminal behavior including felony rape with a concealed weapon (AR 341, 378). Plaintiff is a registered sex offender. AR 341. North Star Counseling found him to have a severe problem with aggression. AR 14. Dr. Hernandez noted poor judgment and impulsiveness resulting in criminal behavior. AR 14, 378. Dr. Garcia acknowledged that Plaintiff's antisocial personality diagnosis and history of antisocial behavior was expressed in his criminal history. AR 88.

Because Plaintiff's antisocial personality disorder had the capacity to have more than a minimal effect on Plaintiff's ability to work, antisocial personality disorder should have been categorized as a severe impairment.

### 3. Back (Lumbar) Pain

In evaluating Plaintiff's back (lumbar) pain, the ALJ rejected Dr. Mehdi's consultative neurological report tying Plaintiff's back pain to severe sequelae of his motor cycle accident (AR 263-67) in favor of Plaintiff's testimony that could carry fifty pounds and "walk all day." AR 48.

The ALJ did not consider Plaintiff's testimony that he could not work because "bending over all day" and "picking things up" caused pain in his lower back. AR 46. Nor did she credit Plaintiff's statement that he did not seek medical treatment for his back because he could "suffer [his] way through it" and "because [he was] healthy and [he could] walk." AR 47.

In contrast, Dr. Mehdi observed that Plaintiff demonstrated spasticity of his lower extremities, walking with a spastic gait. AR 264, 266-67. Plaintiff had slightly limited range of motion in his cervical spine; limited shoulder abduction, flexion and adduction; and severely limited range of motion in his lumbar spine. AR 264-65. Dr. Mehdi diagnosed likely spinal cord damage and thoracic myelopathy, although the symptoms could also be the result of Plaintiff's traumatic brain injury. AR 266-67. Tanya Smith, Plaintiff's transitional case manager also identified Plaintiff as having back pain. AR 197.

Because Plaintiff's back (lumbar) pain had the capacity to have more than a minimal effect on Plaintiff's ability to work, back (lumbar) pain should have been categorized as a severe impairment.

### 4.    Substance Abuse

The ALJ found Plaintiff's substance abuse to be nonsevere because he had entered a residential treatment program; however, the record does not indicate whether Plaintiff successfully completed the program or maintained sobriety thereafter. Plaintiff testified that he had been a lifelong alcoholic but had abstained from drinking under Ms. Lingenfelter's strict supervision.[14] However, his testimony hinted that he could still get a drink by walking to his brother's house. Plaintiff's parole violations generally resulted from alcohol consumption. Plaintiff stated that he was intoxicated when he committed the rape for which he was sent to prison.

Evidence concerning Plaintiff's substance abuse, particularly his use of marijuana, is weaker than evidence of his other allegedly nonsevere impairments. Nonetheless, Plaintiff's

---

[14] Shortly after the administrative hearing, Ms. Lingenfelter was evicted from the property on which Plaintiff's mobile home was parked, and Plaintiff went to live with his brother. AR 10.

alcohol and marijuana abuse had the capacity to have more than a minimal effect on Plaintiff's ability to work and should have been categorized as a severe impairment.

### 5. Misclassification of Plaintiff's Secondary Impairments Was Not Harmless Error

The ALJ erred by disregarding the severity rule and by relying on isolated portions of the record to conclude at step two that Plaintiff's depression, antisocial behavior disorder, substance abuse and back (lumbar) pain were not severe impairments. The error cannot be considered harmless. Under the regulations, an ALJ proceeds to analyze a mental impairment at step three after he or she has determined at step two that the mental impairment is severe. *Keyser v.Comm'r, Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011). Finding any one of the additional mental or physical impairments to be severe at step two would have satisfied the Listing 12.05C requirement of a significant impairment in addition to Plaintiff's intellectual disability (mental retardation) (*see discussion below*). Because no purpose will be served by remanding the case and ordering Defendant to find these impairments to be severe, the Court should reverse the ALJ's findings at step two and find that Plaintiff's depression, antisocial behavior disorder, substance abuse and back (lumbar) pain to be severe impairments.

### IX. The ALJ Failed to Apply Regulatory Procedures Correctly in Rejecting Potentially Applicable Listings at Step Three

Plaintiff contends that the ALJ erred in finding that Plaintiff could not satisfy the requirements of Listing 12.05(c) (2014) in the absence of a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional significant work-related limitation of function. Doc. 49 at 13. He adds that the ALJ further erred in failing to analyze whether Plaintiff's impairments satisfied the requirements of Listing 12.02.[15] Doc. 49 at 14. Defendant responds that the ALJ analyzed

*///*

_____

[15] Because the hearing decision purported to consider the effect, if any, of Plaintiff's depression, analysis of Listing 12.04 (affective disorders was appropriate and likely not mislabeled. The undersigned will not address Defendant's mislabeling argument further.

Listing 12.02, but mislabeled the analysis as Listing 12.04.   Defendant adds that, in any event, Plaintiff failed to bear his burden of proving that he met the requirements of either listing.

Having reviewed the analysis of the listings in the hearing decision and the record as a whole, the undersigned finds that the ALJ's determination was unsupported by substantial evidence, and failed to follow the procedures set forth in the applicable regulations.   Because Plaintiff meets the criteria of Listing 12.05C, however, analyzing all of the potentially applicable listings is not necessary.   The undersigned recommends that the Court reverse the denial of supplemental security income benefits to Plaintiff and remand to the Commissioner for an award of benefits to Plaintiff.

### A.    Step Three Analysis, In General

At step three, an ALJ must determine whether a claimant meets or medically equals an impairment included in 20 C.F.R. Subpt. P, App. 1.  With the exception of Listing 12.05 (Mental Retardation), which is differently structured, an ALJ must determine at step three whether a claimant alleging a mental impairment meets specified diagnostic criteria (paragraph A criteria) and whether specific functional limitations are present (paragraph B criteria).  *Lester*, 81 F.3d at 828.  The paragraph B criteria are intended to measure the severity of the claimant's impairment. *Id.* at 829.

### B.    Burden of Proof in Social Security Hearings

Defendant contends that because Plaintiff failed to carry his burden of proof, the ALJ properly concluded that he did not satisfy the potentially applicable listing requirements.  She is correct that a claimant generally bears the burden of proving his or her entitlement to disability benefits.  *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R § 404.1512(c). However, Social Security hearings are not adversarial proceedings.  *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).  Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision."  *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983).  "The ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.

1983).  *Accord Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Smolen*, 80 F.3d at

1288.  The duty is triggered whenever the evidence is ambiguous or the record is inadequate to

allow proper evaluation of the evidence.  *Mayes*, 276 F.3d at 459-60.

Because mentally impaired claimants may not be able to protect themselves from possible

loss of benefits by furnishing necessary evidence of their limitations, the ALJ's duty to develop

the record fully is "especially important" in such cases.  *DeLorme*, 924 F.2d at 849.  Plaintiff's

inability to respond in his own self-interest is illustrated by his generally unresponsive and

rambling responses to questions presented in the administrative hearing.  For example, Plaintiff

was unable to explain the nature of his treatment at Atascadero State Prison beyond stating that he

was in "some type of a ward, a hospital, or something."  AR 45.  When the ALJ asked Plaintiff

whether he had received treatment for his brain injury (AR 39), Plaintiff responded:

> I have not because it takes doctors to do that.  [INAUDIBLE]
> special edition, and I have not – where I regained consciousness
> was Stockton.  That's a long way from Calaveras County, and I was
> born at Mark Twain Hospital in 1961.  I was born in a hospital at
> least.  And Mark Twain's real name is Samuel Clemens.

AR 40.

Although Plaintiff's nonresponsive and tangential answers were consistent with evidence

in the record reporting his impairments in communicating, the ALJ appeared indifferent to the

evidentiary value of the responses to her questions.  For example, when she asked why he never

had mental health treatment, Plaintiff responded:

> Because I never checked into it.  Now this is all my business.  I
> never interpreted it in that way, in that fashion.  I didn't even – I
> lost my license for five years getting in the motorcycle accident I
> went through – but I was bleeding at the nose and mouth, the ears,
> and the eyes.

AR 43.

Instead of attempting to redirect Plaintiff or to ask about mental health treatment in another way,

the ALJ then simply asked Plaintiff if he ever got his driver's license back.  AR 43.  The ALJ

repeated this pattern throughout the hearing.

///

24

Even if the ALJ could be said to have overlooked Plaintiff's difficulties in responding to questions during the hearing, his intellectual and communicative limitations were apparent throughout the SSI application process. Multiple medical reports and opinions observed Plaintiff's lack of insight into his limitations and inability to advocate for himself. In separate interviews with Plaintiff, the state agency's intake workers noted his unresponsive answers to questions. AR 166, 188. Noting Plaintiff's mental and developmental delays, consulting neurologist Dr. Mehdi opined that Plaintiff "had absolutely no insight into the importance of expressing the disease he had . . . . . He was more interested in telling me about an autograph of a bullrider." AR 263, 266-67. Consulting psychologist Dr. Engeln described Plaintiff as presenting "with dimensions of dementia." AR 271. Parole psychologist Dr. Hernandez also diagnosed dementia due to head trauma and noted Plaintiff's "cognitive impairment," "psychomotor retardation," "circumstantial and perseverative thought processes," "borderline intellectual functioning," and "poor insight and judgment." AR 210, 377-78. CDCR physicians recognized that in addition to apparent mental illness, Plaintiff had cognitive limitations and communicative problems that required slower speech, simple language, and reduced distractions to achieve appropriate responses to their questions. *See, e.g.,* AR 288, 328, 333, 336. Dr. Swanson's consultative opinion reflected no awareness that Plaintiff had experienced a traumatic brain injury in his motorcycle accident. AR 346-50.

In short, the record was more than adequate to alert the state agency and the ALJ of the need to develop the record fully with special attention to uncertain matters whose precise nature would be key in determining whether Plaintiff satisfied one or more listings. Nonetheless, Defendant failed to develop the record fully and fairly and to ensure that the claimant's interests were fully advanced. Under such circumstances, Defendant should not be permitted to blame an adverse outcome on Plaintiff's failure to carry his burden of proof.

### C. The Listings

At the time of Plaintiff's hearing, the Code of Federal Regulations included five listings with possible application to Plaintiff's condition: (1) Listing 11.18, traumatic brain injury; (2)

Listing 12.02, organic brain disorders;[16] (3) Listing 12.04, affective disorders; (4) Listing 12.05, mental retardation; and (5) Listing 12.09, substance addiction disorders. The hearing decision identifies as applicable Listings 12.04, 12.05, and 12.09.

### 1. Listing 11.18, Traumatic Brain Injury

Considered as a whole, the administrative record establishes that Plaintiff's intellectual impairment resulted from a traumatic brain injury. The hearing decision found that Plaintiff's sole severe impairment is "borderline intellectual functioning secondary to post-traumatic brain injury in 1978."[17] AR 19. "The guidelines for evaluating impairments caused by cerebral trauma are contained in 11.18," which "states that cerebral trauma is to be evaluated under 11.02, 11.03, 11.04, and 12.02, as applicable." 20 C.F.R. vol. 2, part 404, subpart P, appx. 1, § 11.00(F) (2012). *See also* 20 C.F.R. vol. 2, part 404, subpart P, appx. 1, § 11.18 (2012) (repeating the direction to evaluate a claimant with traumatic brain injury under 11.02, 11.03, 11.04, and 12.02, as applicable). Because the record includes no evidence of epilepsy or vascular accident, only listing 12.02, organic brain disorders, is appropriate for evaluating Plaintiff's traumatic brain injury. The hearing decision acknowledges Listing 12.02 but never refers to Listing 11.18 and does not evaluate whether Plaintiff meets or medically equals either listing. *See* AR 20-21.

This omission was error. *See Moore v. Astrue*, 2011 WL 1532407 at *3 (D.Mt. Mar. 30, 2011) (No. CV-10-36-GF-SEH-RKS (concluding that the plaintiff's frequent seizures required that the ALJ first consider neurological listings in section 11 before considering mental disorder

---

[16] Because the applicable regulations provide that a traumatic brain injury be evaluated using the provisions of Listing 12.02, the undersigned discusses Listings 11.18 and 12.02 together.

[17] Why the hearing decision uses the nonstandard term "post-traumatic brain injury" is unclear. The National Institute of Neurological Disorders and Stroke provides the following definition and prognosis: "Traumatic brain injury (TBI), a form of acquired brain injury, occurs when a sudden trauma causes damage to the brain." www.ninds.nih.gov/Disorders/All-Disorders/Traumatic -Brain-Injury-Information-Page (accessed Oct. 2, 2018). "Disabilities resulting from a TBI depend upon the severity of the injury, the location of the injury, and the age and health of the individual. Some common disabilities include problems with cognition (thinking, memory, and reasoning), sensory processing (sight, hearing, touch, taste, and smell), communication (expression and understanding), and behavior and mental health (depression, anxiety, personality changes, aggression, acting out, and social inappropriateness). More serious head injuries may result in . . . coma, a state in which an individual is totally unconscious, unresponsive, unaware, and unarousable . . . . ." *Id.* "TBI can be associated with post-traumatic stress disorder." www.medlineplus.gov/traumaticbraininjury.html (accessed Oct. 2, 2018). Traumatic brain injury and post-traumatic stress syndrome are two different conditions.

listings in section 12).  Nonetheless, the Court need not reach this analysis if it agrees with the recommendation to conclude that Plaintiff meets the criteria of Listing 12.05C (mental retardation).

### 2.    Listings 12.04, 12.05 and 12.09

At step three, the ALJ elected to analyze Listings 12.04 (affective disorders), 12.05 (mental retardation), and 12.09 (substance addiction disorders) simultaneously.[18]  A review of the text at AR 21-22 reveals that the analysis was imprecise and confusing:

Importantly, the ALJ did not analyze the part A of Listings 12.04 and 12.09.  The Court need not reach this analysis if it agrees with the recommendation to conclude that Plaintiff meets the criteria of Listing 12.05C (mental retardation).

### 3.    Listing 12.05, Mental Retardation

"Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. vol. 2, part 404, subpart P, appx. 1, § 12.05 (2012).  To satisfy the listing, a claimant must establish one of four alternatives:

> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow instructions, such that use of standardized measures of intellectual functioning is precluded; OR
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less; OR
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1.  Marked restriction of activities of daily living; or
> >
> > 2.  Marked difficulties in maintaining social functioning; or

---

[18] Because the analysis prescribed by Listing 12.05 (mental retardation) differs from that of the other mental impairment listings (20 C.F.R. vol. 2, part 404, subpart P, appx. 1, § 12.00A (2012), these findings and recommendations will address Listing 12.05 below.

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. part 404, subpart P, appx. 1, § 12.05(A-D) (2012).

A formal diagnosis of mental retardation is not required to meet the listing. *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007); *Rowens v. Astrue*, 2010 WL 3036478 at *3 (E.D. Cal. Aug. 2, 2010); *Lewis v. Astrue*, 2008 WL 191415 at *5 (N.D. Cal. 2008).

Based on the evidence included within the record, Plaintiff is not so intellectually disabled as to satisfy Listings 12.05(A) or (B). To meet Listing 12.05(C), a claimant must satisfy three prongs: (1) qualifying IQ scores of 60 through 70; (2) additional and significant work-related limitations of function; and (3) significant subaverage general intellectual functioning (as evidenced by IQ scores) with deficits in adaptive functioning initially manifested during the developmental period, i.e., before age 22. *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00, 12.05, 12.05(C).

### a. Validity of 2007 IQ Scores

Testing administered by Dr. Engeln established that Plaintiff has a valid full scale IQ score of 70. Doc. 49 at 13-14. Defendant counters that "Plaintiff does not appear to have a valid IQ score," contending that the 2007 IQ test (1) was outdated in 2012, (2) administered in conjunction with an earlier application, and (3) obtained when Plaintiff was diagnosed with alcohol abuse. Doc. 50 at 9. The Court should decline Defendant's invitation to invalidate Plaintiff's 2007 IQ score.

"An ALJ is permitted to find that an IQ score is invalid." *Ruiz v. Berryhill*, 2017 WL 5449796 at * 3 (W.D. Wash. October 26, 2017) (citing *Thresher v. Astrue*, 283 Fed.Appx. 473, 475 (9th Cir. 2008)). However, the Ninth Circuit has not specifically addressed "what information is appropriately looked to in deciding validity" when evaluating Listing 12.05. *Thresher*, 283 Fed. Appx. at 475 n.6. In other circuits, courts have permitted an ALJ to consider various factors in determining the validity of test results, "such as evidence of malingering or

feigning results, daily activities inconsistent with the alleged impairment, and psychologists' opinions that are supported by objective medical findings." *Martinez v. Colvin*, 2015 WL 4662620 at *5 (E.D. Cal. Aug. 5, 2015); *see, e.g., Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005) ("Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole"); *Markle*, 324 F.3d at 187 ("[A]n ALJ may reject scores that are inconsistent with the record"); *Lowery*, 979 F.2d at 837 ("I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on claimant's daily activities and behavior").

In this case, the hearing decision did not state that the 2007 IQ scores were invalid; it simply made an ambiguous statement that Defendant interprets as the ALJ's rejecting the 2007 scores:

> [T]he "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related impairment of function. The claimant does not have any other impairments that impose an additional and significant work-relating limitation of function.

AR 21.

The Defendant's contentions that the 2007 IQ scores were dated, were obtained in the context of a prior application, and were affected by Plaintiff's alcohol abuse are no more than the agency's attempt to recharacterize the hearing decision after the fact. *See Lang v. Colvin*, 2016 WL 538484 at * 3 (E.D. Cal. February 11, 2016) (No. 2:15-cv-00624-CKD). District courts review "the adequacy of the reasons specified by the ALJ, not the post hoc rationalizations of the agency." *Id.* "We are constrained to review the reasons the ALJ asserts," and err if we affirm the ALJ's decision based on evidence or reasoning that was not part of the ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). A reviewing court should not be "forced to speculate" on the grounds for an adjudicator's determination. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). This means that the Court should not now consider whether the ALJ could

*///*

have rejected the 2007 IQ scores for one or more of these reasons when she did not do so in the hearing decision itself.

Even if the Court agrees with the recommendation not to reach the Defendant's post-hearing reasons for rejecting the 2007 IQ scores, the question remains whether the ALJ found that Plaintiff satisfied the first prong of Listing 12.05C. As noted, the statement above is ambiguous: does the statement "the claimant does not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related impairment of function" mean that (1) Plaintiff did not meet either prong of the test or (2) Plaintiff did not meet both parts of the test? The hearing decision had already stated in its brief analysis of Listing 12.05B: "The claimant had a verbal IQ of 76, a performance IQ of 68, and a full scale IQ of 70." AR 21. Taken in context, the statement in the 12.05C analysis must mean that that Plaintiff did not have "a physical or other mental impairment imposing an additional and significant work-related impairment of function." Otherwise, the finding at Listing 12.05C would have been inconsistent with the finding at Listing 12.05B.

The Court should conclude that the ALJ found Plaintiff to have satisfied the IQ requirement of Listing 12.05(C).

### b.  <u>Additional and Significant Limitation</u>

The second prong of Listing 12.05C is intended to "assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00A (2012). Such a limitation is congruent with a severe limitation, as defined in 416.920(c). *Id.*

An impairment imposes a significant work-related limitation of function when it is severe under the definition set forth in 20 C.F.R. § 416.920(c). *Rhein v. Astrue*, 2010 WL 4877796 at *10 (E.D. Cal. 2010) (No. 1:09-cv-01754-JLT). "[I]n this circuit, a person who has a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function, meets the second prong of the § 12.05C listing. *Id.* (quoting

*Rowens v. Astrue*, 2010 WL 3036478 at *3 (E.D. Cal. Aug. 2, 2010) (No. 2:09-cv-00163-GGH). When an ALJ has found an additional severe impairment(s) at step 2 of the disability analysis, that finding is sufficient to satisfy the second prong of the analysis of Listing 12.05(C). *See, e.g., Jones v. Colvin*, 149 F.Supp.3d 1251, 1261 (D.Or. 2016); *Pedro v. Astrue*, 849 F.Supp.2d 1006, 1015 (D.Or. 2011); *Gomez v. Astrue*, 695 F.Supp.2d 1049, 1062 (C.D. Cal. 2010).

If the Court has accepted, in whole or part, the undersigned's analysis of step two above, one or all of Plaintiff's secondary impairments (major depressive disorder, antisocial personality disorder, "alcohol abuse in alleged remission," "marijuana abuse in alleged remission," back pain and lumbar strain) have been identified as additional severe impairments in satisfaction of the second prong of Listing 12.05C.

### c. Plaintiff's Impairment Arose Before Age 22

To satisfy the diagnostic description of mental retardation in the introductory paragraph of Listing 12.05, there must be evidence of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before the age of 22." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05 (2014). "The requirement of early onset and the reference to claimant's developmental period . . . seem intended to limit coverage to an innate condition, rather than a condition resulting from disease or accident in adulthood." *Gomez*, 695 F.Supp.2d at 1061 (quoting *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007)) (internal quotation marks omitted). To satisfy the early onset requirement, a claimant need not produce IQ tests or other contemporary evidence of mental retardation before age 22. *Gomez*, 695 F.Supp.2d at 1061. The record need only include some evidence that from which the factfinder can infer that the impairment existed before age 22 and is not of recent origin due to a traumatic event or changed circumstance. *Id.* at 1061 (citing *Markle v. Barnhart*, 324 F.3d 182, 188-89 (3d Cir. 2003)).

There is little question that Plaintiff's intellectual disability was attributable to the traumatic brain injury that Plaintiff incurred at age fifteen: in fact, the ALJ found that Plaintiff's primary impairment was borderline intellectual functioning secondary to post-traumatic brain

31

injury. AR 19. The Commissioner's challenge is that Plaintiff did not have a valid IQ score before age 22. The only IQ score in the record resulted from Dr. Engeln's testing in 2007.

Although the Ninth Circuit has not held that a valid adult IQ score is entitled to a rebuttable presumption that the adult score is evidence of impairment during the claimant's developmental stage, the majority of other circuits have adopted such a presumption. *See Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012); *Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *Luckey v. U.S. Dept. of Health and Human Serv.*, 890 F.2d 666, 668 (4th Cir. 1989). District courts within Ninth Circuit have generally applied the presumption. *See, e.g., Rasmussen v. Berryhill*, 2017 WL 416130 at *4 (E.D. Cal. Jan. 30, 2017) (No. 2:15-cv-00079-DB); *Esparza v. Colvin*, 2016 WL 3906934 at *9 (E.D. Cal. July 18, 2016) (No. 1:15-cv-00748-SKO); *Wooten v. Colvin*, 2013 WL 5372855 at *3 (E.D. Cal. Sept. 25, 2013) (No. 2:12-cv-426-EFB); *Walberg v. Astrue*, 2009 WL 1763295 at *8 (W.D. Wash. June 18, 2009) (No. C08-0956-JCC); *Jackson v. Astrue*, 2008 WL 5210668 at *6 (C.D. Cal. Dec. 11, 2008) (No. CV 08-1623 JC). This court is persuaded by the reasoning in those cases that support a rebuttable presumption that a valid adult IQ score is evidence of impairment during the claimant's developmental phase. *See, e.g. Forsythe v. Astrue*, 2012 WL 217751 at *7 (E.D.Cal. Jan. 24, 2012) (No. 1:10-cv-01515-AWI-GSA); *Campbell v. Astrue*, 2011 WL 444783 at *17 (E.D.Cal. Feb. 8, 2011).

In any event, the developmental requirement does not mean that Plaintiff had to demonstrate that his IQ scores were identical prior to age 22 on but to establish "*significantly subaverage general intellectual functioning with deficits in adaptive functioning* initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before the age of 22." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05 (2014) (emphasis added). A claimant may meet the early onset requirement through circumstantial evidence of his functional level in the critical period. Acceptable circumstantial evidence includes attending special education classes, dropping out in a low grade, struggling to complete a

///

GED, difficulties in multiple subject areas, childhood poor behavior, and an inability to live independently.  *See Gomez*, 695 F.Supp. at 1060-61.

Following his traumatic brain injury at age 15 and ensuing coma, Plaintiff, who had completed tenth grade prior to the accident, was unable to return to high school and attended a continuation school, which he completed without receiving a diploma or certificate.  He never obtained a new driver's license.  Although he had worked in agriculture before the accident, he never worked thereafter.  He remained in the care of his parents and siblings until his arrest on rape charges which led to a term in Atascadero State Hospital to regain competency to stand trial, followed by a prison sentence.  CDCR characterized Plaintiff as a moderately developmentally disabled inmate (DD2) and provided him with assistance in communication, use of the canteen, and other inmate activities and privileges.

The Court should conclude that Plaintiff's intellectual impairment dates to the developmental period before age 22.

### X.    Reversal With Award of Benefits is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate repayment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *Immigration & Naturalization Serv. v. Ventura*, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed only where no useful purpose would be served by further administrative proceedings or where the record is fully developed.  *Varney v. Sec'y of Health and Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

In this case, for the reasons given above, no useful purpose would be served by further administrative proceedings.  The record is fully developed.  The Court should find that Plaintiff has established that as a result of his traumatic brain injury when he was fifteen years old, he

///

33

meets Listing 12.05C(mental retardation), is "presumed disabled, and no further inquiry is necessary." *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991).

Finally, if the Court agrees with the recommendation of the undersigned, it need not consider Plaintiff's remaining argument concerning an alleged error made in the determination of his residual functional capacity at step five. *See Byington v. Chater*, 76 F.3d 246, 250-51 (9th Cir. 1996). If the ALJ had properly evaluated steps two and three, she would never have reached step five.

## XI.  Conclusion and Recommendation

Based on the foregoing, the undersigned recommends that the Court find that the ALJ's decision was not based on proper legal standards, nor supported by substantial evidence in the record as a whole. Accordingly, it is recommended that the Court remand the case to the Commissioner of Social Security for a calculation of benefits only and that the Clerk of Court be directed to enter judgment in favor of Plaintiff Harley McNeil and against Nancy Berryhill, Acting Commissioner of Social Security.

These Findings and Recommendations are submitted to the district judge assigned to this action, pursuant to Title 28 of the United States Code § 636(b)(1)(B). Within **fourteen (14)** days of service of this recommendation, Plaintiff may file written objections to these findings and recommendations with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's Findings and Recommendations pursuant to Title 28 of the United States Code

///
///
///
///
///
///
///

34

section 636(b)(1)(C).  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Wilkerson v. Wheeler*, 772 F. 3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F. 2d 1391, 1394 (9th Cir. 1991); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.  1991)).

IT IS SO ORDERED.

Dated:  __October 26, 2018__          _____ **/s/ Gary S. Austin**
                                                          UNITED STATES MAGISTRATE JUDGE